DAVID E. COFFEY, ET AL., * Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Coffey v. Commissioner
Docket Nos. 29966-81, 29967-81, 4517-82.
United States Tax Court
T.C. Memo 1985-104; 1985 Tax Ct. Memo LEXIS 527; 49 T.C.M. (CCH) 910; T.C.M. (RIA) 85104; March 7, 1985. Gary A. Kleiman and Stanton Rosenbaum, for the petitioners. William F. Garrow, for the respondent. *528 DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' 1976 Federal income taxes as follows: Docket No.
Petitioner
Deficiency
29966-81
David E. Coffey & Florina A. Coffey
$760
Sam S. Lombardi & Shirley A. Lombardi
161,612
Lloyd G. Anderson & Patricia J. Anderson
21,870
29967-81
Frederick C. Borra & Carole B. Borra
30,936
Edwin L. Novak & Karen M. Novak
62,803
4517-82
Victor Elias & Mildred Elias
35,500
The amounts remaining in controversy in this proceeding resulted from respondent's disallowance of losses claimed by petitioners as their distributive shares of the losses of Big Creek Mining Associates, Ltd., a limited partnership formed in 1976 to lease and mine certain coal property in McDowell County, West Virginia. Additional issues concerning losses claimed by petitioners Borra and Novak in connection with investments in Northern Hills Associates have been severed from Docket No. 29967-81 for the purposes of this trial and opinion. The following issues are presented for decision: (1) Whether section 1.612-3(b)(3), Income Tax Regs *529 , as amended by T.D. 7523, 1978-1 C.B. 192, applies to prevent the deduction in 1976 of an advanced royalty claimed by the partnership; (2) Whether any deduction is allowable for the portion of the advanced royalty attributable to a nonrecourse note of the partnership; and (3) Whether the transaction was entered into for profit. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. All petitioners timely filed Federal income tax returns for the taxable year ending December 31, 1976. Respondent timely issued a notice of deficiency of each petitioner. Petitioners David E. and Florina A. Coffey; Sam S. and Shirley A. Lombard; and Lloyd G. and Patricia J. Anderson, husbands and wives, resided in Colorado at the time they filed their petition in docket No. 29966-81. During 1976, Messrs. Coffey, Lombardi and Anderson together owned all the stock of Lombardi Bros. Meat Packers, Inc. (Lombardi Bros.), an electing small business corporation under Subchapter S of the Internal Revenue Code. Prior to October 29, 1976, Lombardi Bros. subscribed and *530 paid $100,000 for a limited partnership interent in Big Creek Mining Associates, Ltd. (the Partnership). On its income tax return for the calendar year 1976, Lombardi Bros. reported a loss of $297,023 as its share of the Partnership loss. Petitioners Frederick C. and Carole B. Borra, husband and wife, and petitioners Edwin L. and Karen M. Novak, husband and wife, resided in Colorado at the time they filed their petition in docket No. 29967-81. During 1976, Messrs. Borra and Novak were general partners in Venture Investments (Venture), a Colorado general partnership. Prior to October 29, 1976, Venture shbscribed and paid $50,000 for a limited partnership interest in the Partnership. On its Form 1065 for the calendar year 1976, Venture reported a loss of $148,512 from the Partnership. Petitioners Victor and Mildred Elias, husband and wife, resided in New York at the time they filed their petition in docket No. 4517-82. In November, 1976, Mr. Elias subscribed and paid for a $20,000 limited partnership interest in the Partnership. On their joint individual income tax return for 1976, the Eliases claimed a loss of $59,447 from the Partnership. In September, 1976, an offering *531 brochure concerning an investment in a West Virginia limited partnership to be formed under the name of Big Creek Mining Associates, Ltd., was prepared and distributed. The offering brochure described a proposed sublease by the Partnership of certain coal property in McDowell County, West Virginia from Big Creek Mining Company, a West Virginia corporation. As initially proposed in the offering memorandum, the general partners were to be Joseph Wolf, Joseph Eckhaus, Sol Fingar, and Robert Tressler. Big Creek Mining Company (Big Creek), the sublessor, was a wholly owned subsidiary of the wolf Corporation, a Delaware corporation controlled by Joseph Wolf. The Wolf Corporation acquired Big Creek in the spring of 1976, at which time Big Creek's only asset a lease entitling it to mine and remove all merchantable and mineable coal from a 40 acre [1] tract in the Big Creek District of McDowell County. Big Creek had acquired the lease by assignment from the original lessee in January 1975. The original lease was executed in April 1974 and was for a term of five years. It required the lessee to pay a royalty of $1 per ton of coal mined and removed from the property, and in addition required *532 a "minimum rental or royalty" of $2,400 per year. At the time he acquired Big Creek, Wolf planned to operate the property himself. Wolf was in the commercial real estate and construction business, and had no experience in coal mining. Prior to the acquisition, Wolf hired Robert Tressler to investigate and evaluate various coal properties, including the Big Creek tract. Tressler was an attorney in Wyoming who specialized in oil and gas law. When Wolf acquired Big Creek, Tressler purchased a $15,000 interest in the lease. [2]
Wolf hired a contract miner to operate the property. During the spring, summer and early fall of 1976, about 4,000 tons of coal were mined from the 40 acre tract and sold by Big Creek. These operations were hindered when the West Virginia Department of Natural Resources issued a cease and desist order because *533 of illegal strip mining methods employed under a deep mining permit.Sometime in late summer, Wolf realized he would need more money to continue the operation, and he began to plan the limited partnership. As initially proposed in the offering brochure distributed in September, $575,000 of limited partnership interests were to be sold in 11.5 units of $50,000 each. The Partnership would sublease the coal rights from Big Creek, and would pay Big Creek an advanced royalty of $1,500,000, payable $500,000 in cash and $1,000,000 by a nonrecourse note. The advanced royalty would be subject to recoupment our of tonnage royalties of $7.20 per ton which otherwise would be payable to Big Creek with respect to coal actually mined, removed and sold by the Partnership. [3]
The offering brochure stated that the offering would terminate on September 30, 1976, subject to the right of the general partner to extend the termination date to November 30, 1976. It also provided that if offers to purchase all the units had not been received and accepted by the termination date, all subscriptions would *534 be returned. The offering brochure provided that offers to purchase the Partnership units should be made by execution a subscription agreement, a form of which was attached to the memorandum. The general partner reserved the right to reject any subscription or to allocate to any investor a fewer number of units than he offered to purchase. The subscription agreement provided for the appointment of the general partner as the attorney-in-fact for the subscriber for the purposes of executing the limited partnership agreement and other necessary agreements incident to the formation of the Partnership. Subsequent to the distribution of the original offering borchure, the nature and scope of the proposed venture changed. Disagreements between the proposed general partners developed, and Tressler ultimately became the sole general partner. Throughout much of the fall of 1976, the scope and specific details of the venture fluctuated, as the size of the proposed transaction was first reduced then later expanded. As is evident from the following discussion of the various documents executed in October, November, and December, it is difficult to precisely reconstruct the timing and sequence *535 of various steps which ultimately culminated in the formation of the Partnership as a going concern. Sometime in October, the scope of the proposed venture was reduced. It was determined that petitioners Coffey, Lombardi and Anderson, d/b/a Lombardi Bros., and petitioners Borra and Novak, d/b/a Venture, would be the only limited partners, and the total capital contribution of the limited partners would be reduced from $575,000 to $150,000. The advanced royalty was to be reduced to $450,000, payable $150,000 in cash and $300,000 by a nonrecourse note. On October 4, Borra and Novak executed a subscription agreement. On October 15, Borra and Novak paid for their subscription by a $50,000 check drawn on the account of Venture. This $50,000 investment represented one unit of a total of three units of limited partnership interest as the transaction was contemplated at that time. Lombardi Bros. executed a subscription agreement which was dated October 4 but was not notarized until October 26. On October 4, Lombardi Bros. paid for its subscription by a check for $100,000, which represented the remaining two units of limited partnership interest. [4]
*536 On October 4, Lombardi executed a limited partnership agreement on behalf of Lombardi Bros. The agreements was in the form of the limited partnership agreement attached to the offering brochure modified to provide that the initial management fee would be $19,565.21 instead of $75,000; that the aggregate cash investment of the limited partners was $150,000 instead of $575,000; and that when the limited partners had recovered their cash investment the cash receipts and profits should be allocated 50 percent to the general partners and 50 percent to the limited partners rather than 66-2/3 percent to the general partners and 33-1/3 percent to the limited partners. The original four persons were named as "General Partners" although only Tressler signed it as a general partner. Sam Lombardi was the only limited partner to sign the document. Lombardi's signature was acknowledged before a notary public on October 4, but Tressler's signature was not acknowledged. Novak and Borra executed an identical partnership agreement dated October 4 on behalf of Venture, but their signatures were not acknowledged. This agreement was not signed by Tressler. On October 4, Tressler, on behalf of *537 the Partnership, executed a document labeled "Amended Sublease Agreement." (The October 4 sublease). [5] This document was substantially identical to the sublease form attached to the offering brochure, but was revised to conform to the new terms of the transaction as modified. The October 4 sublease stated in a "whereas" clause that Big Creek desired to sublease and the Partnership was willing to accept a sublease of only 26.058 percent of Big Creek's coal rights. [6] The production royalties to be paid remained at $7.20 per ton, as proposed in the original offering brochure, but the advanced royalty was reduced to $450,000, payable $150,000 in cash and $300,000 by a nonrecourse note. This document also acknowledged that Big Creek had successfully negotiated an extension of the lease for an additional term of thirty months with an option to renew for an additional term of five years. *538 The "Amended Sublease Agreement" executed by Tressler on October 4 was not executed by a representative of Big Creek Mining Company. On October 12, the original lease was amended by an Addendum to Lease executed by the original lessors and lessees. The addendum recognized Big Creek as the assignee, and added additional acreage contiguous to the original tract which increased the size of the leased area to approximately 90 acres. In addition, the addendum extended the term of the lease for a period of five years (to October 12, 1981) and granted Big Creek an option to renew the lease for another five years (to October 12, 1986). On October 22, Tressler executed a Certificate of Limited Partnership on behalf of the Partnership, as general partner, and on behalf of Venture and Lombardi Bros., as attorney-in-fact pursuant to the subscription agreements. The certificate was filed in McDowell County Court on November 3. The certificate listed Tressler as the sole general partner, and Venture and Lombardi Bros. as the limited partners contributing $50,000 and $100,000, respectively, to capitalize the Partnership. Also on October 22, Novak and Lombardi (on behalf of Venture and *539 Lombardi Bros., respectively) each acknowledged receipt and approval of an Amendment to Offering Brochure which reflected the modification of the transaction since the distribution of the original offering brochure. The amended brochure made the following changes to the original brochure: reduced the capitalization of the Partnership to three units of $50,000 each ($150,000 total) from 11.5 units of $50,000 each ($575,000 total); reduced the advanced royalty to $450,000 from $1,500,000; provided that Tressler would be the sole limited partner; changed the determination date of the offering from September 30 to October 4 (with provision for extension to November 30); and reduced the management fee payable to the general partner to $19,565 from $75,000. [7] The amended offering brochure also stated for the first time that Tressler was an officer and director of Big Creek. [8]
*540 On October 29, the Internal Revenue Service issued an information release announcing the proposed amendment of section 1.612-3(b)(3), Income Tax Regs, as those regulations pertained to the deductibility of advanced royalties. Under the new proposed regulation, a copy of which accompanied the information release, a lump sum advanced royalty such as involved herein would not be deductible when accrued, but rather in the year in which the mineral product was sold. The information release also provided that the amended regulation, if adopted, would not apply to advanced royalties required to be paid pursuant to a mineral lease which was binding prior to October 29. Tressler and Wolf became aware of this proposed amendment at the time of the information release. The original offering brochure, in fact, cautioned prospective investors that the Internal Revenue Service might take such action. [9]
*541 Sometime between October 22 and late November, a decision was made to increase the size of the transaction. [10] One factor involved in the decision to further modify the deal was the acquisition of the additional acreage under the addendum to the original lease. On November 24, petitioner Victor Elias paid for a subscription by a check in the amount of $20,000. Elias executed a subscription agreement on November 29. A second "Amended Sublease Agreement" (the November 29 sublease) was acknowledged by Tressler and Wolf on behalf of the Partnership and Big Creek, respectively, on November 29, 1976. This document stated that it was "made as of the 17th day of October, 1976," but the signatures were not acknowledged by a notary until November 29. This *542 document is the only sublease agreement in evidence which was executed by a representative of Big Creek. The November 29 sublease stated that "the parties desire to amend the sublease, dated October 4, 1976, to give effect to the extension of the Lease and the inclusion of the contiguous land." This document did not refer to any sublease prior to the October 4 sublease discussed above. [11]
The November 29 sublease reflected the expanded scope of the transaction. The agreement provided that the Partnership would pay Big Creek a production royalty of $8.40 per ton of all coal mined, removed and sold from the coal property. It further provided that the Partnership would pay an advanced royalty of $2,100,000, payable $700,000 in cash upon the execution of the agreement, and $1,400,000 by a nonrecourse note bearing interest at 10 percent and due April 12, 1989. The advanced royalty was to be recoupable out of the production royalties. Tressler executed a Promissory Note on behalf of the Partnership dated November 30, 1976. The note provided that the Partnership would pay Big Creek $1,400,000 with interest at 10 percent per annum, "payable as to *543 principal and interest at a rate of $5.50 per ton of all coal mined, removed and sold from certain coal properties subleased by the undersigned from Big Creek Mining Co. . . ." The note would become due and payable on April 12, 1989. It further provided that the Partnership "executes this note wholly without recourse and the only remedy available to the holder hereof in the event of default hereunder shall be to declare the leasehold referred to above in default." On December 22, Tressler, as general partner and as attorney-in-fact for the limited partners, executed an Amended Certificate of Limited Partnership. The amended certificate listed eighteen limited partners and a total capital contribution of $480,000. Petitioner Victor Elias was included in this list. Most of the new limited partners contributed $20,000. The certificate did not indicate the dates on which the new limited partners executed subscription agreements or paid their capital contributions. The certificate was filed in McDowell County Court on December 28. Also on December 22, Tressler, as general partner and as attorney-in-fact for the limited partners, executed a revised Agreement of Limited Partnership. *544 This partnership agreement listed 26 limited partners with a total capital contribution of $700,000, which was consistent with the terms of the November 29 sublease. The partnership agreement executed on December 22 was substantially identical to the agreements executed by Venture and Lombardi Bros. in October except that only Tressler was named as general partner and there were 26 limited partners named. The December agreement, however, merely duplicated the limited partnership agreement which was attached as an appendix to the original offering brochure, and did not reflect certain modifications of the transaction. For example, the paragraph discussing allocations of profits and losses referred to an aggregate cash investment by the limited partners of $575,000, rather than $150,000 as provided in the October 4 agreement or $700,000 as provided in the final transaction. This agreement also stated the management fee payable to the general partner to be $75,000, although that figure had been reduced to $19,565 by the partnership agreement executed in October, and was further revised by the Second Amendment to Offering Brochure (discussed below) to $91,275. On December 29, a *545 Second Amendment to Offering Brochure was acknowledged by Novak. The document was not dated. The following statement appeared immediately above Novak's signature: I hereby acknowledge that I have received and approved the attached amendments to the Offering Brochure dated the 15th day of October, 1976, pursuant to which, I have subscribed to certain limited partnership interests in Big Creek Mining Associates, Ltd. [12]
Novak's signature was acknowledged by a notary public as follows: On the 29th day of December, 1976, before me, the undersigned, a notary public, personally appeared Edwin L. Novak known to me as the person whose name is subscribed to the within instrument and acknowledged that he executed the same. The Second Amendment to Offering Brochure reflected the *546 further modification of the transaction. It stated that the offering consisted of 35 units of $20,000 each, that the offering would terminate on November 30, subject to the right of the general partner to extend the termination date to December 31, and that if offers to purchase all units were not received by that date all subscriptions theretofore received would be returned without interest or deductions. It further provided, consistent with the November 29 sublease agreement, that the advanced royalty would consist of $700,000 cash and a nonrecourse note in the amount of $1,400,000, and that the advanced royalty would be subject to recoupment out of the production royalties. Also consistent with the November 29 sublease, the Second Amendment to Offering Brochure provided that production royalties were payable at the rate of $8.40 per ton of coal mined, removed and sold by the Partnership, [13] but added a proviso that the advanced royalty would be subject to recoupment by the Partnership at the rate of $5.50 per ton out of the $8.40 per ton royalties actually paid. On December 30, *547 Tressler executed a Second Amendment to Certificate of Limited Partnership. This document listed eight new limited partners, with an aggregate capital contribution of $200,000. Combined with the first amended certificate executed on December 22, this brought the total number of limited partners reflected on the certificates to 26, with a total capital contribution of $680,000. Although the partnership agreement executed on December 22 also listed 26 limited partners, it stated the total capital contribution to be $700,000. The $20,000 discrepancy resulted from an understatement on the certificate of one partner's cash contribution. The Second Amended Certificate of Limited Partnership was filed in McDowell County Court on January 13, 1977. In May, 1976, Zin Min, a mining engineer, was hired by Big Creek to evaluate the coal reserves on the leased property. Min had a B.A. in mining engineering from Lehigh University, and had previously worked on coal mining projects. Min conducted field inspections during which he prepared elevations and boundary surveys of the various coal seams on the property. He spent approximately two weeks on the site. Min measured exposed coal veins *548 at outcrops, and measured one seam that did not outcrop by digging a hole with a backhoe. He did not drill any core holes, because of the expense involved. However, he took into consideration in making his estimates of reserves the fact that the coal property was surrounded by active mines operated by U.S. Steel. Min prepared a report dated May 22 which contained an analysis of the coal reserves on the tract as well as a cash flow estimate for the proposed mining operation. He estimated that there were 332,227 tons of recoverable reserves on the tract. This estimate was based on the assumption that three of the four minable seams would be strip mined, with a 100 percent recovery rate. Min estimated the recoverable reserves at 373,116 tons if all four seams were strip mined. Min's estimate of recoverable reserves did not take into account any coal reject factor. Min supplemented his report on October 17 to take into account the additional acreage acquired under the addendum to the lease. The supplemental report estimated recoverable reserves of 467,601 tons, assuming that three seams were strip mined and one seam was deep mined. The Partnership did not enter into a long-term *549 contract for the sale of its coal, but rather intended to sell coal on the spot market. The Partnership entered into an agreement with a coal broker who agreed to use his best efforts to sell the Partnership's coal in the spot market. During the summer and fall of 1976, prior to the closing of the sublease agreement with the Partnership, Big Creek mined and sold some coal produced from the property at a price of $34.80 per ton. Although Big Creek had only deep mining permits, it mined this coal using strip mining methods. This method of mining was common prior to 1976 because of the lack of strick reclamation requirements and lax enforcement of the regulations that did exist. However, by 1976 the regulatory climate was changing, and stricter federal and state laws governing strip mining were enacted. [14] The Partnership was unable to obtain any strip mining permits for the Big Creek tract. The Partnership did not mine any coal in 1976. After *550 two arrangements with contract miners fell through, [15] the Partnership contracted with a third contract miner in 1978, and mining operations commenced in late 1978. The miner discovered that one seam was unminable because of inadequate roof conditions. Furthermore, the miner received a number of fines and assessments from state and Federal regulatory authorities, and was unable to comply with reclamation requirements. The operation shut down in the early summer of 1980. A total of approximately 5,000 tons of coal were mined by the Partnership. [16]
*551 The Partnership reported its income on the accrual method of accounting. On its Form 1065, U.S. Partnership Return of Income, for the taxable year 1976, the Partnership claimed a deduction for advanced royalties in the amount of $2,100,000. The Partnership reported no income in 1976. In his notice of deficiency, respondent disallowed the deduction claimed on the Partnership return on the following alternative grounds: (1) the loss was not incurred in a transaction entered into for profit; (2) the deduction of the advanced royalties in 1976 does not clearly reflect income; (3) the advanced royalties were not paid or accrued pursuant to the regulations prescribed under section 612, I.R.C. 1954; (4) the deduction attributable to the nonrecourse note is not properly accruable pursuant to the regulations prescribed under section 461, I.R.C. 1954. OPINION The sole issue for decision is whether, and to what extent, petitioners are entitled to deduct their respective distributive shares of the losses of Big Creek Mining Associates, Ltd., (the Partnership), a West Virginia limited partnership formed in October 1976 to lease and mine *552 certain coal property in West Virginia. The Partnership was conceived by Wolf who controlled Big Creek Mining Company (Big Creek), the sublessor, through which he had operated the coal property during the summer and fall of 1976. Wolf caused the Partnership to be formed as a means of securing additional capital to continue the operations. Tressler, who had assisted Wolf in connection with the acquisition of Big Creek, and who held an interest in the coal lease, became the sole general partner when Wolf and two other prospective general partners withdrew. The sublease transaction between the Partnership and Big Creek evolved throughout the months of October, November, and December of 1976, and underwent two major modifications before a final agreement was reacheed which provided that the Partnership would pay Big Creek an advanced royalty of $2,100,000, payable $700,000 in cash and $1,400,000 by a nonrecourse note which was secured only by the sublease and was payable only out of the proceeds of the sale of coal. The entire advanced royalty was recoupable only out of the tonnage royalties that would otherwise be payable for coal mined and sold by the sublessee. The Partnership *553 claimed a deduction of $2,100,000 as an advanced royalty in 1976, and reported a loss of $2,100,588. [17] Petitioners claimed their distributive shares of the Partnership's loss on the returns of Lombardi Bros. (petitioners Coffey, Lombardi and Anderson), Venture (petitioners Borra and Novak) and on their individual return (petitioners Elias). The Partnership mined no coal in 1976. There is no evidence in the record that the Partnership made any payments to Big Creek on the note. Respondent disallowed the losses claimed on several alternative grounds. His primary argument is that the Partnership did not enter into a binding obligation prior to October 29, 1976 requiring it to pay the advanced royalty, so that section 1.612-3(b)(3), Income Tax Regs, as amended by T.D. 7523, applies to the transaction and prevents any deduction for advanced royalties in 1976 because no coal was mined and sold by the Partnership in 1976. Respondent alternatively argues that no deduction is allowed for the portion of the advanced royalty attributable to the nonrecourse note *554 because the note is too contingent and speculative to be recognized for tax purposes. Finally, respondent argues in the alternative that no deduction is allowed because the transaction was not entered into for profit. We first consider the issue concerning the applicability of section 1.612-3(b)(3), Income Tax Regs.
Section 1.612-3(b)(3), Income Tax Regs., prior to its amendment by T.D. 7523, provided in pertinent part: The payor, at his option, may treat the advanced royalty so paid or accrued in connection with mineral property as follows: (i) as deductions from gross income for the year the advanced royalties are paid or accrued, or (ii) as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid, is sold. Rev. Rul. 74-214, 1974-1 C.B. 148 interpreted this regulation to permit the deduction in the year paid of a lump sum cash royalty paid prior to production and recoupable against production royalties required to be paid for coal produced in years subsequent to the cash payment. The cash royalty was found to qualify as an advanced royalty *555 within the meaning of the regulation. On October 29, 1976, respondent announced the proposed amendment of section 1.612-3(b), Income Tax Regs. (hereinafter "the regulation") concerning the deductibility of certain advanced royalties paid in connection with interests in minerals. The proposed regulation was adopted without substantial modification in December, 1977. T.D. 7523, 1978-1 C.B. 192. [18]The amended regulation generally allows the deduction of advanced royalties for the year the mineral product, in respect of which the advanced royalties are paid or accrued, is sold, unless the advanced royalties are paid pursuant to a specifically defined "minimum royalty provision." See generally Wendland v. Commissioner,79 T.C. 355, 378-379 (1982), affd. 739 F.2d 580 (11th Cir. 1984), affd. sub nom. Redhouse v. Commissioner,728 F.2d 1249 (9th Cir. 1984); Wing v. Commissioner,81 T.C. 17, 22-24 (1983). The parties agree in the instant case that if the amended version of the regulation *556 applies, the Partnership is not entitled to any deduction for the advanced royalty in 1976. The announcement on October 29, 1976 concerning *557 the proposed regulation indicated that the new rules would not apply in the case of advanced royalties which were "required to be paid pursuant to a mineral lease which was binding prior to [October 29, 1976] upon the party who in fact pays or accrues such royalties." IR-1687, October 29, 1976. In adopting the final regulation, respondent, pursuant to his authority under section 7805(b) [19] to determine the retroactive effect of regulations, stated as follows in T.D. 7523, supra:
In order to modify the treatment of advanced royalties paid or accrued in connection with mineral property, section 1.612-3 of the Income Tax Regulations (26 CFR Part 1) is amended by revising paragraph (b)(3), effective with respect to advanced royalties which are paid or accrued in connection with mineral property on or after October 29, 1976 (the date of News Release IR-1687 announcing the proposed amendment). However, the amendment will not apply if prior to October 29, 1976 (i) the payment of the advanced royalties was required pursuant to a mineral lease which *558 was binding upon the party who in fact pays or accrues such royalties, or (ii) the payment of the advanced royalties was required by reason of a written contract which bound the party who in fact pays or accrues such royalties to execute a lease requiring the payment of the advanced royalties. For purposes of clause (ii) of the preceding sentence, the party must establish, to the satisfaction of the Secretary or his delegate, that under all the facts and circumstances the contractual obligation to pay advanced royalties was binding upon him prior to that date. In addition, a contract will in no event be considered to be binding upon the party if the obligations imposed on the party prior to October 29, 1976, were not substantial or were illusory. In the case of advanced royalties paid or accrued by a partnership the "party" who, under the preceding paragraph, must be obligated prior to October 29, 1976, with respect to the payment of the advanced royalties is the partner, not the partnership. For purposes of the preceding sentence, a partner is considered obligated prior to October 29, 1976 if *559 the partnership was obligated immediately prior to that date and then only to the extent of the partner's distributive share of the partnership's liability for such payment immediately prior to that date. But see Elkins v. Commissioner,81 T.C. 669 (1983). At the time the amended regulation was adopted, respondent also issued Rev. Rul. 77-489, 1977-2 C.B. 177, which revoked Rev. Url. 74-214. However, consistent with the determination is T.D. 7523 concerning the new regulation's retroactive effect, Rev. Rul. 77-489 indicated that taxpayers satisfying the binding obligation requirement set forth in T.D. 7523 would be able to rely on the interpretation of the old regulation in Rev. Rul. 74-214. See Wendland v. Commissioner,supra, at 378-379 for a summary of these various rulings. The issue for decision is whether the Partnership *560 entered into a binding obligation prior to October 29, 1976 requiring it to pay the advanced royalty to Big Creek. If such a binding obligation existed, respondent concedes that the old regulation, as interpreted by Rev. Rul. 74-214, applies to allow the deduction of the advanced royalty. Respondent argues that the nature and scope of the proposed transaction changed almost continuously throughout October, November, and December of 1976, and that the Partnership did not finally execute a binding sublease agreement until at least late November. Respondent also argues that it was not possible for the Partnership to be bound by a sublease prior to October 29 because the entry of the majority of the limited partners after that date caused a "cancellation" of the original partnership and the reformation of a new distinct partnership. Petitioner argues that, despite certain ambiguities or technical infirmities in the documents, the record as a whole establishes that the Partnership entered into a binding sublease prior to October 29 requiring it to pay advanced royalties to Big Creek. We agree with respondent that the record does not establish the existence of a binding obligation *561 prior to October 29, 1976. [20]
The transaction between the Partnership and Big Creek appears to have evolved almost continuously from the time of the distribution of the original offering brochure in September, to the time of the acknowledgement of the final sublease agreement by Tressler and Wolf on November 29. During that period, the proposed transaction underwent a variety of major modifications. The amount of the advanced royalty was listed at $1,500,000 in the original brochure, $450,000 in the amended brochure (dated October 22), and $2,100,000 in the second amended brochure (dated December 29). The corresponding aggregate capital contributions of the limited partners changed from $575,000, to $150,000, and finally to $700,000. The anticipated number of general partners changed from 4 to 1; the limited partners from 10 or 11 to 2, *562 and then to 18 to 26. The cost of a limited partnership unit was reduced from $50,000 to $20,000. The limited partnership interests changed.The acreage leased was almost doubled; the closing date changed. In addition, various modifications were made to the tonnage royalty and recoupment provisions, as well as to the amount of management fees payable to the general partner. While these major modifications of the transaction are readily apparent, it is much more difficult to derive from the numerous documents and other evidence the precise timing of the various steps. We are confronted with various brochures, partnership agreements, partnership certificates, and subleases, most appearing in original, amended, and second-amended form, the dates of execution of which are in some cases uncertain or in other cases inconsistent with the dates of other documents. In short, the record in this case defies a precise chronological reconstruction. However, we think it is clear, after careful consideration of the various documents and the testimony concerning the development of the transaction, that the Partnership did not enter into a binding obligation prior to October 29 to pay the $2,100,000 *563 advanced royalty to Big Creek. Because the time of the execution of certain documents is critical to the resolution of the issue before us, a chronology may be helpful in reconstructing the sequence of events. Although not all inclusive of every event leading to the execution of the sublease, the following chronology indicates the dates of execution, where possible, of the relevant documents, and the dates of relevant events: Date *
Description of Event
September
Offering Brochure distributed. (Proposed $1,500,000
advanced royalty, payable $500,000 cash and $1,000,000
note. Capitalized $575,000 by limited partners; 11.5
units at $50,000 each).
October 4
Venture executed subscription agreement.
Lombardi Bros. paid for subscription by $100,000 check.
Lombardi Bros. & Tressler executed Partnership Agreement.
Date of Partnership Agreement executed by Venture (not
notarized). ** Date of "Amended Sublease Agreement." Signed only by
Tressler. (Modified terms: $450,000 advanced royalty,
payable $150,000 cash and $300,000 note).
October 12
Addendum to original Lease executed. (Increased to 90.5
acres. Term extended to 1981, with option to renew to
1986).
October 15
Venture paid for subscription by $50,000 check.
Alleged date of Second Amendment to Offering Brochure.
(Not notarized until December 29).
October 17 ** Alleged date of "Second Amended Sublease Agreement."
(Made "as of October 17;" not executed until November 29).
October 22
Certificate of Limited Partnership executed by Tressler.
(Conformed to terms of October 4 sublease).
Amendment to Offering Brochure executed by Venture and
Lombardi Bros. (Modified terms: $450,000 advanced
royalty, payable $150,000 cash and $300,000 note.
Capitalized $150,000 by limited partners; 3 units at
$50,000 each).
October 26
Subscription Agreement of Lombardi Bros. (dated October
4) notarized.
October 29
Internal Revenue Service announced proposed amendment of
Section 1.612-3(b), Income Tax Regs.
November 24
Elias paid for subscription by $20,000 check.
November 29 ** Second "Amended Sublease Agreement" (dated "as of
October
17") acknowledged by Tressler and Wolf. (Modified terms: $2,100,000 advanced royalty, payable $700,000 cash and
$1,400,000 note).
Elias executed Subscription Agreement.
November 30
Date of Promissory Note (not notarized) signed by
Tressler. ($1,400,000 due on April 12, 1989. Interest
at 10% per annum payable out of proceeds from coal sales).
December 22
Amended Certificate of Limited Partnership executed by
Tressler. (Included 18 limited partners, total capital
contribution of $480,000).
Revised Limited Partnership Agreement executed by
Tressler. (Included 26 limited partners, total capital
contribution of $700,000).
December 29
Second Amendment to Offering Brochure (dated October 15)
acknowledged by Novak. (Modified terms: $2,100,000
advanced royalty, payable $700,000 cash and $1,400,000
note. Capitalized $700,000 by limited partners; 35 units
at $20,000 per unit).
December 30
Second Amendment to Certificate of Limited Partnership
Executed by Tressler. (Included 8 additional partners
contributing $200,000 capital).
*564 Respondent concedes that a partnership was formed prior to October 29, consisting of Tressler as general partner and Lobardi Bros. and Venture as limited partners. [21] Respondent contends, however, that even this partnership did not enter into a binding obligation prior to October 29, 1976 to pay an agreed upon definitive advanced royalty within the meaning of Section 1.612-3(b)(3), Income Tax Regs. We agree with respondent. We think an examination of the sublease agreements and the events surrounding their execution points to this conclusion. *565 The sublease agreements are the only documents which would have bound the Partnership or the partners to pay advanced royalties. The offering brochures simply explain the proposed transaction and how it would be carried out. The limited partnership agreements provided the organization which would be used to implement the transaction. The subscription agreements evidenced the intent of the individual investors to pay the entry fee and join the Partnership. While these documents are necessary and helpful to delineate the overall picture, to provide the investor-players, and to bind them to certain obligations between each other, none of them binds the participant to pay royalties, advanced or otherwise, for the right to mine, remove and sell the coal contained in the leased property. So we must look primarily to the sublease agreements to decide the issue before us. It is not entirely clear which of the two sublease documents petitioners rely on the support their contention that the Partnership entered into a binding obligation prior to October 29 to pay the advanced royalty. In their opening brief, petitioners rely solely on the sublease agreement acknowledged on November 29, *566 but dated "as of October 17." Their argument with respect to this document, essentially, is that the parties negotiated the agreement to modify the transaction in mid-October, but failed to execute the written sublease agreement until late November. However, in their reply brief, petitioners appear to rely on the October 4 sublease also, which related to a transaction of considerably smaller size. While the copy of the latter document that is in evidence was signed only by Tressler, the general partner, [22] and not by a representative of Big Creek, the sublessor, petitioners contend that the terms of this sublease were agreed to by Big Creek, and thus created the requisite binding obligation. The October 4 sublease, which bears the heading "Amended Sublease Agreement," [23] first refers to the original lease dated April 12, 1974, whereby *567 the owners leased to the original lessors the right to mine and remove coal from 40 acres in McDowell County, West Virginia, which lease was subsequently assigned to Big Creek, and then states: Whereas, Big Creek desires to assign and sublease some 26.058% of its rights * * * under the lease, and the partnership is willing to receive and accept the assignment and sublease and to assume said rights * * *. However, the operative clause in this document provides that "Big Creek hereby assigns to the Partnership all of its rights under the lease * * *." Although the document contains a signature line for the sublessor, it was no signed by a representative of Big Creek. Nevertheless, petitioners contend that the October 4 sublease was also executed by Big Creek. Petitioners have the burden of proof on this question. Rule 142(a); [24]Welch v. Helvering,290 U.S. 111 (1933). We find petitioners' argument unpersuasive in light of the evidence before us. *568 Neither Wolf nor anyone else from Big Creek were called as witnesses at the trial, although there was no showing that Wolf, who was the initiator of the transaction, was unavailable. Petitioners rely on the testimony of Tressler, but we find his testimony to be inconclusive on this point -- he simply assumed that the sublease was signed for Big Creek. Petitioners also argue that other documents in evidence indicate that the October 4 sublease was executed by Big Creek. Only one other document refers to the October 4 sublease, which is the later sublease acknowledged by Tressler and Wolf on November 29. That document was executed a month after the I.R.S. announcement which established the October 29 effective date for the amendment to the regulations. Given the parties' mutual interest in assuring that the transaction would qualify for the liberal treatment of advanced royalties under the old regulation, we are unable to accept the later sublease as proof of the actual execution of the October 4 sublease. Petitioners also offered an opinion letter from an attorney named Loewe, and affidavits from Wolf and Eckhaus concerning the effective date of the sublease. These were obtained *569 by Tressler in late November, after the importance of the October 29 date became clear. They are inadmissible as hearsay for the purpose of proving that the Partnership entered into a binding obligation to pay an advanced royalty prior to October 29. Furthermore, petitioners' failure to offer the oral testimony of Wolf, who presumably would be the person most knowledgable about Big Creek's intentions, raises a presumption that such evidence would be unfavorable to their case. Witchita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The fact that Wolf, who was the principal officer of Big Creek, signed the November 29 sublease but did not sign the October 4 agreement leads us to believe that he did not want to sublease the property to a three member partnership with only $150,000 in cash. For these reasons, we are not convinced that the October 4 sublease was executed by Big Creek; virtually all the objective evidence points to the contrary. Nevertheless, it remains to be considered whether the October 4 sublease constitutes a binding obligation despite the absence of the lessor's signature. *570 This is an issue to be decided on the basis of state law. See Anderson v. Commissioner,568 F.2d 386, 389-390 (5th Cir. 1978), affg. a Memorandum Opinion of this Court. The parties are in agreement that the relevant law to be applied in this case is the law of West Virginia. It is a well established principle of contract law that the lack of a signature on a writing does not necessarily render the agreement unenforceable. 1 A. Corbin, Contracts, § 31, p. 112 (1963). An unsigned agreement, all the terms of which are embodied in a writing, unconditionally assented to by both parties, is an enforceable contract. 1 A. Corbin, supra at 117. West Virginia law generally accepts these principles. Herndon v. Meadows,86 W. Va. 499, 103 S.E. 404 (1920). But whether the parties have assented to the document as expressing the views upon which they have agreed is a question of fact which cannot be determined from the writing itself. Reference must be made to extrinsic evidence which reflects the intention of the parties. 17 C.J.S., Contracts § 62 (1963). *571 The burden of proving the existence of a valid contract is on the party asserting it. Dickinson v. Rand,102 W. Va. 574, 136 S.E. 42 (1926). We are unable to find on this record any credible evidence that Big Creek assented to the terms of the October 4 sublease and intended that document to represent a valid and binding contract. The evidence establishes that the proposed transaction underwent a process of almost continuous revision throughout the months of September, October and November, finally culminating in an agreement having terms substantially different than the terms of the October 4 sublease. That sublease was substantially different in its terms from the transaction described in the offering brochure as well. While at one point the parties may have contemplated entering into an agreement involving only two limited partners, who would invest only $150,000 in cash, [25] this is illogical and any such plans were soon abandoned because of Wolf's desire to expand the transaction. The record as a whole clearly indicates that the entire transaction was in a state of flux throughout September, October and most of November. We believe that none of the parties *572 considered themselves bound to any terms, at least until the Second Amended Sublease Agreement was acknowledged by Wolf and Tressler on November 29. The feasibility of the project depended on having sufficient cash available to start up the operation and that capital was apparently available only in smaller amounts subscribed to by a greater number of investors. The offering brochure made it clear that if all the proposed units were not subscribed for by the closing date, all subscriptions previously received would be returned. We do not believe Wolf or Big Creek intended to be bound until this was assured. It is worthy of note that the nonrecourse note was not executed until November 30. Petitioners face an additional hurdle on this issue given a line of cases in West Virginia which establish that where an instrument has been executed by only a portion of the parties between whom it purports to be made, it is not binding on those who have *573 executed it. Stalnaker v. Stalnaker,139 W. Va. 658, 80 S.E. 2d 878, 883 (1954); Blair v. Dickinson,133 W. Va. 38, 54 S.E. 2d 828 (1949); Brown v. Western Maryland Ry. Co.,92 W. Va. 111, 114 S.E. 457 (1922); Ely v. Phillips,89 W. Va. 580, 109 S.E. 808, 810 (1921); Herndon v. Meadows,supra. In Herndon v. Meadows the West Virginia Supreme Court held that a coal lease was not a binding contract because it lacked the signature of one of the two lessees. The court stated: Where the parties to a contract reduce their agreements to writing, with the purpose and expectation that the same shall be signed by all of the parties before the agreement is completed, the failure or refusal of one party thereto to execute will excuse all of the parties from performance. [103 S.W. at 405.] The West Virginia courts have recognized an exception to this rule in situations where other evidence demonstrates that the agreement of the parties is complete, and the writing is simply regarded as a memorial of the contract already entered into by the parties. Herndon v. Meadows,103 S.E. at 405; *574 Ely v. Phillips,109 S.E. at 810. But the evidence in this case does not warrant an exception to the general rule. The record is devoid of any evidence that Big Creek intended to be bound by the October 4 sublease. The fact that the transaction was modified several times between October 4 and November 29 belies such an intent. We conclude that Big Creek neither executed the October 4 sublease nor assented to its terms by any other conduct manifesting an intention to adopt it as a binding contract. T.D. 7523 provides that the amended regulation will not apply if prior to October 29, 1976, the payment of the advanced royalties was required pursuant to a lease which was binding upon the party who in fact pays or accrues such royalties. We do not believe the attempt to back date the sublease of November 29 by use of the words "as of October 17" was effective to fix the date the obligation became binding for purposes of T.D. 7523. The $150,000 advanced royalty proposed in the October 4 sublease was never paid or accrued because subsequently the transaction was substantially modified to provide a new $2,100,000 advanced royalty. We think the *575 revised transaction created a substantially different and distinct royalty obligation which must quality independently under the retroactivity provisions of T.D. 7523. Only the $2,100,000 advanced royalty was paid or accrued, and that obligation was not the subject of a requisite binding obligation in place prior to October 29. We think this interpretation of T.D. 7523 is consistent with the statutory presumption in favor of the retroactive effect of regulations interpreting the Internal Revenue laws. Redhouse v. Commissioner728 F.2d at 1251. Generally the Commissioner has discretion to determine the retroactive application of a regulation and this discretion will be upheld unless there is evidence of unconscionable injury or undue hardship suffered by the taxpayer, or other unusual circumstances. Manocchio v. Commissioner,78 T.C. 989, 1001 (1982), affd. 710 F.2d 1400 (9th Cir. 1983). The safe harbor of non-retroactivity is the exception and not the rule and we think a taxpayer seeking to avail himself *576 of a ruling by the Commissioner that a regulation is non-retroactive must demonstrate an unequivocable compliance with the terms of the non-retroactivity provision. This petitioners have failed to do. Instead it appears that petitioners have attempted to back date transactions and have revised numerous documents to avoid the retroactive application of the regulation. We conclude that the October 4 sublease does not relieve petitioners from the application of the amended regulation. The sublease signed on November 29 stated that it was "made as of the 17th day of October, 1976." Petitioners contend that an agreement encompassing the terms of this sublease was actually made in mid October, but that the parties neglected to formally execute a written sublease until late November. Thus they argue, the Partnership was obligated prior to October 29 to pay the $2,100,000 advanced royalty to Big Creek. Petitioners have failed to direct us to any convincing evidence that such an informal agreement was reached in mid October. We find the record to be to the contrary. The various documents executed in October relate only to the much smaller proposed transaction involving two limited *577 partners and an advanced royalty of $450,000. Although it is not exactly clear when the decision to expand the transaction was made, we think it is significant that the first evidence of additional limited partners is the subscription agreement executed by Elias on November 24. It is possible that at sometime in October, perhaps following the execution of the original lease addendum, the parties discussed a further modification of the transaction and may even have agreed in principle to proceed with such plans. But such preliminary discussions fall short of establishing the binding obligation required by T.D. 7523, particularly where the transaction is of such a nature that the parties unquestionably intended that it be reduced to writing and finally executed. Blair v. Dickinson,133 W. Va. 38, 54 S.E. 2d 838 (1949). It is unlikely that the parties could have reached a firm agreement to modify the deal (which modification involved most of the crucial elements in the deal, such as the size of the property leased, the terms of the lease, the amounts of the advanced and production royalties) prior to assuring themselves of the availability of additional *578 investors. Elias was listed on the Amended Certificate of Limited Partnership filed on December 22, which suggests that the additional limited partners did not sign up until late November or early December. Furthermore, we are convinced, viewing the record in its entirety, that Big Creek and the Partnership did not intend to enter into any binding contract prior to the execution of a written sublease containing all of the final terms of the deal. See Sandor v. Commissioner,62 T.C. 469, 483-484 (1974), affd. per curiam, 536 F.2d 874 (9th Cir. 1976). We cannot conclude that a binding agreements was entered into in mid October that was simply memorialized by the sublease agreement executed on November 29, 1976. As a result we do not find that prior to October 29, 1976, payment of the advanced royalties was required pursuant to a mineral lease which was binding on the Partnership or the petitioners prior to that date. Consequently, the amended regulation 1.612-3(b)(3) is applicable to deny the partnership and the petitioners a deduction for the advanced royalties paid or accrued in 1976, in which year no coal was sold by the Partnership. Respondent *579 also argues that even if the Partnership and Big Creek made an oral agreement in mid October to revise the transaction in accordance with the terms of the sublease agreement executed on November 29, such an agreement would be unenforceable under the statute of frauds and therefore would not satisfy the binding obligation requirement of T.D. 7523. In light of our conclusion above we need not decide this issue, and we decline to do so, although there appears to be some merit in respondent's position. See Section 36-1-3, W. Va. Code (1980); Ross v. Midelburg,129 W. Va. 851, 42 S.E. 2d 185 (1947); Sartori v. Commissioner,66 T.C. 680 (1976). We likewise voice no opinion on whether this transaction was entered into for profit. Respondent also argues in the alternative that if we conclude that the Partnership or any of the petitioners (primarily those associated with Lombardi Bros. and Venture) were obligated to pay the advanced royalties prior to October 29, 1976 so that section 1.612-3(b)(3), Income Tax Regs. prior to amendment would apply, nevertheless that part of the advanced royalties represented by the *580 nonrecourse note would not be deductible in 1976 because the note was illusory and a sham, or was so contingent that the obligation stated therein was not accruable. For the reason mentioned above we need not and do not decide this issue either. [26]
*581 Decision will be entered for respondent in docket numbers 29966-81 and 4517-82.
An appropriate order will be entered in docket number 29967-81.
Footnotes
*. By our Order dated May 9, 1983, the following cases were consolidated for purposes of trial, briefing, and opinion: David E. Coffey, Florina A. Coffey, Sam S. Lombardi, Shirley A. Lombardi, Lloyd G. Anderson and Patricia J. Anderson, docket No. 29966-81; Frederick C. Borra, Carole B. Borra, Edwin L. Novak and Karen M. Novak, docket No. 29967-81; and Victor Elias and Mildred Elias, docket No. 4517-82.↩
1. The offering memorandum describes the Big Creek tract as comprising 48 acres, but the lease and the addendum thereto, as well as the sublease agreement, describe the original tract as 40 acres.↩
2. It is no clear whether Tressler's interest in the lease was through ownership of stock in the Wolf Corporation, or by some other arrangement.↩
3. Attached as an exhibit to the offering memorandum was a sublease form containing these terms.↩
4. These subscription agreements were on a form attached to the offering brochure. They did not indicate how many units were being subscribed for or how much was being paid.↩
5. The term "amended" is misleading, as there is no evidence of any prior sublease, and the sequence of events makes it clear that this document represents the first agreement to be proposed between the Partnership and Big Creek. The document is "amended" only in the sense that its terms vary from the form of the sublease attached to the original offering brochure. The use of the term "agreement" in connection with the documents labeled "sublease agreement" herein is for descriptive purposes only and does not imply any legal or factual conclusion as to whether such documents represent a "binding obligation" for the purposes of T.D. 7523, 1978-1 C.B. 192↩. 6. The document is inconsistent on this point. The preface portion states Big Creek's desire to sublease "26.058% of its rights" under the lease. However, the operative language assigns "all of its rights under the lease."↩
7. Tressler testified that he never received any management fee from the Partnership. The amended brochure contained mathematical inconsistencies concerning the amounts of the management fees and the advanced royalties. It stated that the $19,565 management fee would be deducted from the $150,000 cash contribution, which would make it impossible for the Partnership to pay the $150,000 cash portion of the advanced royalty. On one page, the amount of the advanced royalty was stated to be $150,000. Another page stated that the $450,000 advanced royalty would be paid by $130,435 cash and a nonrecourse note of $1,000,000 (sic). The discussion of the recoupment of the advanced royalty also made no sense mathematically. These errors may be attributable to the fact that the offering brochures were prepared primarily to satisfy requirements of securities laws, and were not regarded by the parties as controlling the substance of the transaction. ↩
8. When questioned on this point, Tressler did not state that he was an officer or director of Big Creek; he testified only that he "invested in" Big Creek and that he held an interest in the lease. See note 2, supra.↩
9. Upon learning of the I.R.S. announcement, Tressler expressed his concern to Wolf and suggested that Big Creek refund the money to the limited partners. He was advised by Wolf that the transaction was in compliance with the requirements outlined in the I.R.S. announcement.↩
10. The record is unclear as to the precise point at which the transaction was modified, and the reasons for such modification. Tressler testified that the nature and scope of the transaction "changed a number of times," and that "it was changing almost on a weekly basis." However, the (first) amendment to the offering brochure discussed above described the venture as offering only 3 limited partnership units of $50,000 each.↩
11. See note 5, supra.↩
12. It is uncertain what the October 15, 1976 date in the acknowledgment referred to.The original Offering Brochure was not dated, the First Amendment to Offering Brochure was not dated but was acknowledged on October 22, 1976, and the document to which the acknowledgment was attached, the Second Amendment↩ to Offering Brochure, was not dated but Novak acknowledged receipt of same on December 29, 1976.
13. On one page of this document, the amount of the advanced royalty was stated to be $700,000.↩
14. As noted above, Big Creek's operations in 1976 were hindered by a cease and desist order issued by the West Virginia Department of Natural Resources upon the discovery that Big Creek was employing unlawful strip mining methods.↩
15. At the time the offering brochure was distributed, Big Creek had entered into a mining contract with a contract mining company, according to which the contractor would be paid $20 per ton for strip mined coal and $21.50 per ton for deep mined coal. The contractor agreed to use its best efforts to produce 5,000 tons of coal per month. Big Creek intended to assign the mining contract to the Partnership. However, in 1977, the contractor refused to perform under the contract. ↩
16. No production or sales records pertaining to the coal mined by the Partnership were introduced into evidence. Tressler testified that the coal was sold at prices ranging from the "low teens" to $39 per ton.↩
17. The additional $588 claimed was apparently due to administrative expenses.↩
18. The relevant portion of the final regulation, sec. 1.612-3(b)(3), reads as follows: * * * (3) The payor shall treat the advanced royalties paid or accrued in connection with mineral property as deductions from gross income for the year the mineral product, in respect of which the advanced royalties were paid or accrued, is sold. . . However, in the case of advanced mineral royalties paid or accrued in connection with mineral property as a result of a minimum royalty provision, the payor, at his option, may instead treat the advanced royalties as deductions from gross income for the year in which the advanced royalties are paid or accrued. . . For purposes of this paragraph, a minimum royalty provision requires that a substantially uniform amount of royalties be paid at least annually either over the life of the lease or for a period of at least 20 years, in the absence of mineral production requiring payment of aggregate royalties in a greater amount. * * *↩
19. Section 7805(b) provides: * * * (b) RETROACTIVITY OF REGULATIONS OR RULINGS--The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.↩
20. Respondent has argued on brief that petitioners Elias might be treated differently than the other petitioners, due to the fact that the Eliases did not enter the Partnership until November, 1976. Because of our holding herein, we need not address this issue. However, see Elkins v. Commissioner,81 T.C. 669↩ (1983).
*. Unless otherwise indicated, all dates are in the year 1976. ** Dates relevant to sublease agreements.↩
21. We think this concession may be generous. If the Partnership was formed for the bona fide purpose of mining coal profitably from this lease it stood to reason that an injection of more than $150,000 in cash was required. We doubt that the Partnership was ever intended to be comprised of only 2 limited partners. Respondent also contends that even assuming that the Partnership entered into a binding obligation to pay an advanced royalty prior to October 29, 1976, such an obligation would relate only to the 3 member partnership formed in October which was later "cancelled" by the addition of 24 limited partners after October 29. Respondent cites no authority for this cancellation-reformation theory and in light of our conclusion on the central issue we need not discuss it here. However, our somewhat cursory consideration of the subject leads us to disagree with respondent's theory that admission of new partners would necessarily cause the dissolution of the Partnership. See W. Va. Code, chapter 47, articles 8A and 9 (1980). Also see J. Crane and R. Bromberg, Law of Partnership 444, 519 (1968); Bromberg, Partnership Dissolution, 43 Tax L. Rev. 631, 636, 637 (1965). We also note that a contrary determination on this issue would be inconsistent with the decision in Elkins v. Commissioner,81 T.C. 669↩ (1983), in which this Court implicitly sanctioned the admission of additional limited partners in a similar context.
22. As we indicated in our findings of fact, one document indicates that Tressler was also an officer and director of Big Creek. This was not confirmed by Tressler's testimony. Petitioners do not argue that Tressler acted in any capacity other than general partner of the Partnership, and there is no evidence in the record which suggests otherwise.↩
23. No earlier sublease signed by anyone was offered in evidence. A form of a sublease agreement dated "September    " was attached to the offering brochure. ↩
24. Rules of Practice and Procedure, United States Tax Court.↩
25. This may explain why the "whereas" clause in the October 4 sublease mentioned assignment of only 26.058% of Big Creek's rights in the lease.↩
26. However, we cannot refrain from commenting on the illusory nature of this note and other notes that seem to be involved in many of the plethora of coal shelter cases that have come before this and other courts recently. Such notes are either payable only out of production royalties or the remedy of the holder is limited to cancellation of the lease for which it was presumably part payment. The lease itself will invariably provide that a royalty of so much per ton will be payable by the lessee to the lessor on every ton of coal mined.The obligation to pay royalties is fixed by the terms of the lease. So what purpose is served by the note except that it hopefully will provide the maker with an income tax deduction for accrued royalties in the year it is executed, regardless whether it is ever paid or whether there was any intention by either party that it be paid. This clearly gives rise to a distortion of income and should not be permitted unless it can be shown that there was some valid business purpose for executing a nonrecourse note. An advanced royalty obligated and paid in cash when the transaction is finalized may be required for some legitimate business reasons but the taxpayer who seeks to deduct such royalties in a year prior to the year in which the coal is mined and sold should be required to show unequivocally that the purpose was valid and the prepaid royalty was not paid simply to distort and avoid tax. See Surloff v. Commissioner,81 T.C. 210, 237-238 (1983); Tallal v. Commissioner,T.C. Memo 1984-486↩, note 65 and cases cited therein, (on appeal, 5th Cir.)